# EXHIBIT A

## EXCLUSIVE LICENSE AGREEMENT

Effective *February 13*, 2003, Ardenté Inc. (LICENSOR), a corporation organized and existing under the laws of the State of California and having a principal place of business at 840 Wedgewood Dr., Pittsburg, CA 94565, and StirChef LLC (LICENSEE), a limited liability company organized and exiting under the laws of the State of Connecticut, having a principal place of business at 32 Henry St., Bldg 17A, Bethel CT, 06801, agree as follows:

### ARTICLE I
### GENERAL

1.01 LICENSOR and LICENSEE are hereafter occasionally referred to as "parties" (in singular or plural usage, as indicated by the context).

1.02 Terms in this Agreement (other than names of parties and Article Headings) which are set forth in upper case letters have the meanings established for such terms in Articles II and IV of this Agreement.

1.03 LICENSOR is the owner of United States Letters Patent No. 6,113,258, granted on September 5, 2000.

1.04 LICENSOR represents that it is in a position to grant to LICENSEE a license on the terms and conditions as hereafter set forth.

### ARTICLE II

### DEFINITIONS

2.01 U.S. PATENT means U.S. Patent No. 6,113,258.

2.02 LICENSED PRODUCTS means any and all products which would, pursuant to 35 U.S.C. § 271, infringe any claim of the U.S. PATENT but for the license grant hereunder.

2.03 FIELD means the consumer and retail markets and excludes the commercial market.

### ARTICLE III

### LICENSE GRANT AND RESERVATIONS

3.01 For the term of this Agreement, the LICENSOR grants and agrees to grant to the LICENSEE an exclusive, non-transferable license to make, have made, use, sell or import LICENSED PRODUCTS for sale in the FIELD.

3.02 LICENSEE shall not grant sublicenses to the U.S. PATENT to others for LICENSED PRODUCTS, except for the purposes of having LICENSED PRODUCTS made, without express written consent of LICENSOR.

3.03 The LICENSEE agrees to promptly disclose to the LICENSOR any developments or improvements which it may make or has made to the device disclosed in the U.S. PATENT, provided such development or improvement is a LICENSED PRODUCT. LICENSEE, at its option, may file patent applications in the United States and internationally on such developments and improvements. If LICENSEE files such patent applications, LICENSEE may pay all costs and expenses in connection with the preparation, filing and prosecution of

1

such applications and in such case shall own such patent applications and any and all patents issuing therefrom. Alternatively, LICENSEE, at its sole option, may permit LICENSOR to pay for seventy-five percent (75%) of such expenses and in exchange for such payment will assign such patent applications and patents issuing therefrom to LICENSOR and LICENSOR shall provide an exclusive paid-up license to LICENSEE for such patent applications and patents which is commensurate in scope with the license of Sections 3.01 and the term and any renewals thereof of this Agreement.

**ARTICLE IV**

**ROYALTIES, REPORTS AND PAYMENTS**

4.01 LICENSEE shall pay royalties to LICENSOR on LICENSED PRODUCTS at the rate of the higher of (a) $ 100,000.00 per year (paid quarterly in four equal installments of $25,000) or (b) four percent (4%) of the NET SELLING PRICE of all such LICENSED PRODUCTS sold or otherwise disposed of during the life of this Agreement.

4.02 NET SELLING PRICE with respect to LICENSED PRODUCTS sold means invoice price, f.o.b. factory (not less than actual manufacturing price), after deduction of any amounts on account of taxes; discounts; co-op advertising and marketing chargeback allowances; freight charges; and returns but before deduction of any other items, including, but not limited to, agents' commissions.

4.03 Where LICENSED PRODUCTS are not sold, but are otherwise disposed of, such disposition of LICENSED PRODUCTS shall be royalty-free for the first 2500 units, and for all additional units at a rate of four percent (4%) of the average net selling price for the quarter in which such units were disposed.

4.04 LICENSEE shall pay LICENSOR royalties at the rates specified in this Agreement on all LICENSED PRODUCTS which are produced by LICENSEE or sold or otherwise disposed of by LICENSEE throughout the term of this Agreement.

4.05 The expression LICENSED PRODUCTS "otherwise disposed of" means:

(a) LICENSED PRODUCTS not sold or delivered by LICENSEE to others, regardless of the basis of compensation, if any;

(b) LICENSED PRODUCTS put into use by LICENSEE for any purpose other than routine internal testing prior to sale or other disposition of such LICENSED PRODUCTS; and

(c) LICENSED PRODUCTS not sold as such but sold by LICENSEE as components or constituents of other products.

4.06 In order to assure LICENSOR the full royalty payments contemplated in this Agreement, in the event any LICENSED PRODUCTS shall be sold for resale either:

(a) to a corporation, firm, association or other entity which, or individual who, owns a controlling interest of LICENSEE by stock ownership or otherwise, or

(b) to a corporation, firm, association or other entity in which LICENSEE or its stockholders own a controlling interest by stock ownership or otherwise, the royalties

2

to be paid with respect to such LICENSED PRODUCTS shall be calculated according to 4.01 and based upon the price at which an entity which is not a subsidiary or affiliate or otherwise related to LICENSEE, resells such products, rather than upon the NET SELLING PRICE of LICENSEE.

4.07 LICENSEE shall make written reports to LICENSOR quarterly within forty-five (45) days after the first day of each January, April, July and October through the life of this Agreement, and as of such dates, stating in each such report the number, description, country of sale and aggregate NET SELLING PRICES of LICENSED PRODUCTS sold or otherwise disposed of during the preceding three (3) calendar months and upon which royalty is payable as provided in this Article.

4.08 Concurrently with the making of each report, LICENSEE will pay to LICENSOR royalties at the rate specified in this Article IV on the LICENSED PRODUCTS included in the report.

4.09 In addition to the royalties owed to LICENSOR under this Agreement, LICENSEE has paid LICENSOR an initial advance of thirty thousand dollars ($30,000.00) under the Exclusive License Preliminary Terms Agreement to be held in an escrow account. Said $30,000.00 shall be dispersed upon the execution of this Agreement.

4.10 Under this Agreement, LICENSED PRODUCTS shall be considered to be sold when billed out or when they leave control of LICENSEE if otherwise disposed of, except that upon expiration of the U.S. PATENT covering such LICENSED PRODUCTS, or upon any termination of license, all shipments of LICENSED PRODUCTS from LICENSEE's manufacturer of such products where such shipments were made on or prior to the date of such expiration or termination which have not been billed out or which have not otherwise left control of LICENSEE shall be considered as sold (and therefore subject to royalty).

4.11 LICENSEE agrees to keep true and accurate records, files and books containing all the data reasonably required for the full computation and verification of the royalties to be paid and the information to be given in the reports provided for in this Agreement; LICENSEE further agrees to permit its books and records to be examined from time to time to the extent necessary to verify such reports. Should LICENSOR discover a discrepancy in favor of LICENSOR of more than two percent (2%) between the reports provided by LICENSEE and the examination results of LICENSOR, then LICENSEE shall pay for the expenses of the audit and interest on the amount of discrepancy at a rate of prime plus 4% from the date such amount was due. For this section, the prime rate shall be determined from the Wall Street Journal on the date such discrepancy was discovered.

4.12 If a re-examination of the U.S. PATENT is filed before the USPTO, and the re-examination results in the narrowing of the scope of at least claim 1 in the U.S. PATENT by adding one or more limitations to such claim, then the Parties will attempt to agree on a reduced royalty rate and minimum royalty payments. If no such agreement can be made, the parties agree to submit the issue to binding arbitration. Such reduction in royalties and minimum royalty payments shall become effective in the quarter following the final determination of the USPTO resulting in the narrowing of the claim(s) of the US PATENT as set forth in this paragraph, but in no event less than one year from the initiation of the re-examination.

4.13 LICENSEE shall annually and upon any packaging or product change furnish one case of free samples to LICENSOR of any and all LICENSED PRODUCTS including its packaging.

4.14 If during the first three years of this Agreement LICENSEE fails to meet the minimum

royalty payments of Section 4.01 or to make aggregate royalty payments of at least $600,000 over the first three years, at LICENSOR's sole option, the license grant may be (a) terminated, or (b) converted into a non-exclusive license.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES; LIMITATION**

5.01 LICENSOR warrants that to the best of its knowledge:

(a) LICENSOR is not aware of any facts that may affect the validity or scope of the U.S. PATENT; and

(b) anything made, used, sold, or otherwise disposed of under any license granted in this Agreement is or will be free from infringement of patents of third persons.

5.02 Nothing in this Agreement shall be construed as:

(a) a requirement that either party shall file any patent application, secure any patent, or maintain any patent in force; or

(b) an obligation to bring or prosecute actions or suits against third parties for infringement of any patent; or

(c) an obligation to furnish any manufacturing information, or any information concerning pending patent applications; or

(d) granting by implication, estoppel, or otherwise, any licenses or rights under applications or patents other than as to the US PATENT.

5.03 LICENSOR does not make any representations, extend any warranties of any kind, either express or implied, or assume any responsibilities whatsoever with respect to use, sale, or other disposition by LICENSEE or its vendees or transferees of LICENSED PRODUCTS.

5.04 LICENSEE will hold LICENSOR harmless against all liabilities, demands, damages, expenses, or losses arising out of use by LICENSEE of inventions licensed under this agreement; or out of any use, sale, or other disposition by LICENSEE of products made by use of such inventions.

5.05 LICENSOR assumes no obligation or liability to indemnify or otherwise hold harmless or reimburse LICENSEE for any expense, obligation or liability incurred upon any judgment or settlement, or any defense of any actual or threatened suit for infringement of patents owned or controlled by any person or entity, or for failure in manufacture or design of the LICENSED PRODUCTS.

5.06 LICENSEE shall obtain and maintain, at its own expense, insurance coverage relating to claims for injury and/or property damage based on the use of the LICENSED PRODUCTS as manufactured or sold or otherwise disposed of and to supply certificates of insurance evidencing such coverage. LICENSOR shall be named as an additional insured. Coverage shall be obtained in an amount not less than $1,000,000 in the aggregate.

5.07 In the case a third party is believed to be infringing on the US PATENT:

4

(a) Each party shall immediately communicate the details to the other Party. LICENSOR shall thereupon have the right, but not the obligation, to take whatever action it deems necessary, including the filing of lawsuits, to protect the rights of the parties to this Agreement and to terminate such infringement. LICENSEE shall cooperate with LICENSOR if LICENSOR takes any such action, but all expenses of LICENSOR shall be borne by LICENSOR. If LICENSOR recovers any damages or compensation for any action it takes hereunder, LICENSOR shall retain 100% of such damages.

(b) If LICENSOR does not institute an infringement suit within thirty (30) days after LICENSEE's written request that it do so, LICENSEE may institute and prosecute such lawsuit in the name of LICENSOR. LICENSEE shall be entitled to retain 75% of any damages or compensation it recovers for any such infringement and shall pay 25% of such damages or compensation to LICENSOR, after deducting LICENSEE's costs, including attorneys fees. During the life of the lawsuit, royalties shall be reduced to two percent (2%), in view of the costs of the suit.

(c) Any lawsuit shall be prosecuted solely at the expense of the Party bringing suit. The Parties agree to fully cooperate with the other Parties in the prosecution of any such suit. The Party bringing suit shall reimburse the other Parties for the expenses incurred as a result of such cooperation.

5.08 LICENSOR represents that the U.S. PATENT has been legally assigned to LICENSOR and that such assignment has been recorded in the U.S. Patent Office.

5.09 This Article shall survive termination of this Agreement.

**ARTICLE VI**

**MARKING OF PRODUCTS**

6.01 Within a reasonable time after the execution of this Agreement, LICENSEE agrees to conspicuously mark all LICENSED PRODUCTS sold by it under the license granted a patent notice in accord with 35 U.S.C. § 282 referencing U.S. Patent No. 6,113,258.

**ARTICLE VII**

**TERM AND TERMINATION**

7.01 As used herein, the word "termination" includes any and all means of bringing to an end prior to its own terms this Agreement, or any provision thereof, whether by release, discharge, abandonment, or otherwise.

7.02 The word "termination" and cognate words, such as "term" and "terminate," used in this Article VII are to be read, except where the contrary is specifically indicated, as omitting from their effect the following rights and obligations, all of which shall survive any termination to the degree necessary to permit their complete fulfillment or discharge:

(a) LICENSEE'S obligations to supply a terminal report in respect to terminated licenses;

(b) LICENSOR'S right to receive or recover and LICENSEE'S obligation to pay royalties accrued or accruable for payment at the time of any termination;

5

(c) LICENSEE'S obligation to maintain records and LICENSOR'S right to conduct a final audit as provided in Article IV of this Agreement;

(d) licenses and releases running in favor of customers or transferees of LICENSEE with respect to LICENSED PRODUCTS sold or transferred by LICENSEE prior to termination of this Agreement or of any license arising under this Agreement subject to payment of any royalties payable with respect to such LICENSED PRODUCTS; and

(e) any cause of action or claim of LICENSOR accrued or to accrue, because of any breach or default by the LICENSEE.

7.03 The term of the license granted under Paragraph 3.01, shall be for three years from the execution date hereof. If the total royalty payments for the previous three years is at least $600,000, at LICENSEE's sole option, the license grant may be renewed for an additional three-year term. For each subsequent three-year term, if the royalty payments are at least $600,000, at LICENSEE's sole option, the license grant may similarly be renewed. In the first renewal period in which royalty payments are less than $600,000, the Agreement may be renewed by LICENSEE but if so renewed LICENSOR shall have the option to convert the license grant into a non-exclusive license. The royalty rates for the non-exclusive license shall be the same as the royalty rates for the exclusive license, but no minimum annual payments shall be required. Once the license grant is converted into a non-exclusive license, the term of such license shall be for the life of the U.S PATENT.

7.04 LICENSOR may terminate this agreement at any time in the event of a default by LICENSEE in the due observance or performance of any covenant, condition, or limitation of this License Agreement required to be performed by LICENSEE, but only if LICENSEE shall not have remedied its default within thirty (30) days after receipt from LICENSOR of written notice of such default.

7.05 The provisions as to payment of all royalties covered herein not yet obligated to be paid shall not apply to any LICENSED PRODUCTS covered by any claim of said US PATENT which will have theretofore finally been held to be invalid or so construed as not to cover such LICENSED PRODUCTS by a Court of final competent jurisdiction from which an appeal is not taken within the time specified by law. The payment provisions however shall apply to LICENSED PRODUCTS covered by any claims of said US PATENT which have not been held to be invalid.

7.06 It is agreed that if LICENSEE does not introduce the LICENSED PRODUCTS within one year from the effective date hereof, or if LICENSEE does not sell the LICENSED PRODUCTS for any 90 consecutive days anytime after the introduction date, unless there are significant unforeseen problems, including acts of war and God, problems with the manufacturer, and/or the manufacturer's ability to ship LICENSED PRODUCTS, then LICENSOR has the option to either (a) terminate the license granted herein, or (b) convert the license hereunder into a non-exclusive license.

7.07 If at any time LICENSEE or any successor entity decides to permanently terminate sale of LICENSED PRODUCT, LICENSEE agrees that after the disposition of any stock of LICENSED PRODUCT or sooner, LICENSEE or the successor party will provide a written statement to LICENSOR that all licenses granted hereunder and the Agreement are terminated so that LICENSOR may seek to exclusively license a third party under the U.S. PATENT. Upon receipt of such written statement, LICENSOR and LICENSEE shall be mutually relieved of any obligations to the other under the Agreement, except that LICENSEE shall still be obligated to LICENSOR for payment of royalties on goods sold or

otherwise disposed prior to such termination and for reporting under Article IV.

## ARTICLE VIII

## NOTICES; APPLICABLE LAW; HEADINGS

8.01 Any notice, report, or payment provided for in this Agreement shall be deemed sufficiently given when sent via a reliable express carrier (return receipt requested) addressed to the party for whom intended at the address given at the outset of this Agreement or at such changed address as the party shall have specified by written notice.

8.02 Notice served as provided for in the above paragraph shall be deemed given seven (7) days following the date of deposit with the carrier. If notice is given other than as provided in the above paragraph, then the burden of proving service and receipt by the addressee shall be upon the party alleging service of notice. Either party may change its effective address by giving thirty (30) days' notice of the new address.

8.03 This agreement shall be governed in all respects by the laws of the State of California in the United States of America, except that its conflict of law rules shall not apply. LICENSEE accordingly submits itself to the jurisdiction of the Courts of California concerning any controversies or claims arising out of this Agreement.

8.04 The heading of the Articles in this Agreement shall serve only reference purposes and for convenience and are not binding or intended to limit or expand the breadth of the provisions thereunder.

## ARTICLE IX

## TRANSFERABILITY AND ASSIGNMENT

9.01 Any license or release granted in this Agreement in respect to the U.S. PATENT shall be binding upon any successor in ownership or control of the LICENSOR.

9.02 This Agreement is assignable by LICENSEE to a successor party that succeeds to the entire business of the LICENSEE and assumes its assets and liabilities.

## ARTICLE X

## INTEGRATION; MODIFICATION; SEVERABILITY

10.01 This instrument contains the entire and only Agreement between the parties and supersedes all preexisting agreements between them respecting its subject matter. Any representation, promise, or condition in connection with such subject matter which is not incorporated in this Agreement shall not be binding upon either party.

10.02 No modification, renewal, extension, waiver, and (except as provided in Article VII hereof) no termination of this Agreement or any of its provisions shall be binding upon the party against whom enforcement of such modification, renewal, extension, waiver, or termination is sought, unless made in writing and signed on behalf of such party by one of its executive officers.

10.03 If any part of any Article or Paragraph of this Agreement shall be rendered or declared unenforceable by any decision of any court of competent jurisdiction, the

remainder of this Agreement shall remain in full force and effect and shall be construed as if such unenforceable provision had not been in this Agreement, unless the absence of the unenforceable provision shall substantially destroy the business purpose of this Agreement.

10.04 This Agreement may be executed in counterparts, all of which, when taken together, shall constitute one agreement with the same force and effect as if all signatures had been entered on one document. This Agreement was drafted jointly by the Parties. Therefore, in any construction of this Agreement, the Agreement shall not be construed against either party.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by its duly authorized representative.

Ardenté Inc.

By: _____
John Ardent

Its: PRESIDENT

StirChef LLC

By: _____
Warren Tuttle

Its: PRESIDENT

8

# EXHIBIT B




## MUTUAL RELEASE UNDER LICENSE AGREEMENT

THIS AGREEMENT, made this __12TH__ day of February, 2004, by and among ARDENTE, INC., a California Corporation, with its office located at 840 Wedgewood Drive, Pittsburgh, California (hereinafter "Licensor"), and STIRCHEF, LLC, a Connecticut Limited Liability Company, with its office located at 32 Henry Street, Building 17A, Bethel, Connecticut, (hereinafter "Licensee").

WHEREAS, on February 13, 2004, Licensor and Licensee entered into an Exclusive License Agreement (hereinafter "License") for the production and distribution of Licensed Products in connection with U.S. Patent No. 6,113,258;

WHEREAS, pursuant to said License, Licensee was granted certain exclusive, non-transferable rights to make, use, sell or import the Licensed Products covered by said License;

WHEREAS, Licensee agreed to pay Licensor certain royalties and payments for the exclusive and non-transferable rights granted to it under the License; and

WHEREAS, said License provided a process for the termination of the License by the Licensee.

NOW THEREFORE, for the mutual considerations agreed to by and among the parties hereto, the Licensor and Licensee agree as follows:

1. On or about November 14, 2003, Licensee gave and delivered to Licensor its written terminating the License as required by Section 7.07 of the License, which letter of termination was thereafter accepted by Licensor.

1

Sent By: SIERRA MTN EXPRESS;          925 602 0720;        Feb 12 04 11:00AM;     Page 4/6

2. By this Mutual Release Under License Agreement (hereinafter "Release"), Licensee covenants and agrees that:

A. It will not attend any trade shows promoting the sales of any License Products under the Licensee;

B. Except for a previously committed ad to be printed in the February 16, 2004 edition of "Gourmet News", it will cease to place any trade ads for the Licensed Products;

C. It will attempt to sell to its current customers or liquidators all inventory and stock it has on hand as soon as possible, and in any event no later than December 31, 2004; and will maintain its telephone and fax lines until the inventory is dispose of, not withstanding, the closing of Licensee's office;

D. It will cease producing and importing the StirChef or E-Zstir products forthwith;

E. It will not make an announcement that Licensee is discontinuing its business;

F. It will accept the resignations of James Richardson and Paul Lorocco as employees;

G. It will provide a full report of sales for the last quarter of 2003;

H. It will, not later than February 16, 2004, pay to Licensor the sum of $20,000.00; and

I. It warrants that Licensee will abandon any patent applications pending under provision 3.03 of the License.

2

3. Upon payment of the sum of $20,000.00, pursuant to provision H above, Licensee shall have no further obligation to pay royalties on the inventory and stock it has on hand. Licensee's exclusive license is hereby terminated, however, Licensee shall retain a non-exclusive License until all inventory is sold or disposed, said non-exclusive License to terminate no later than December 31, 2004. Except for payment of royalties, Licensee shall comply with the applicable provisions of Articles 5 to 7, namely, 5:01-5.06, 5.07(a) only, 5.09, 6.01, 7.01, 7.02, 7.05 and 7.07 and with those provisions referenced therein. The obligation to maintain insurance under provision 5.06 shall expire on December 31, 2004.

4. Except for these obligations arising under the above referenced provisions of Articles 5 to 7 of said Exclusive License Agreement; and in consideration of the covenants, agreements and conditions herein, both the Licensor and the Licensee, each to the other, release and forever discharge, the other of them and the other's successors and assigns forever, and do remise, release and forever discharge the other, and the other's successor and assigns, of and from any and all manner of actions and actions, cause and causes of action, suit, damages, judgments, executions, property damage and demands whatsoever, in law or in equity, which each has ever had, or now has, against the other and the other's successors and assigns, arising out of or being a part of said Licensee.

3

IN WITNESS WHEREOF, each of the parties has caused this Mutual Release Under License Agreement to be executed by its duly authorized representative, this ___12 TH___ day of February, 2004.

STIRCHEF, LLC
By: _____
Richard Shanley, Member

ARDENTE, INC.
By: _____
John Ardent, President

4